The next matter is number 221782, Trina Wilkins et al. v. Genzyme Corporation. At this time, would counsel for the appellants, Mr. Geske, please introduce himself on the record to begin. Good morning, Your Honors. Jonathan Geske here on behalf of the plaintiff's appellants. This is my co-counsel, Dr. Alan Black. If Your Honors permit, I would like to reserve two minutes for rebuttal. You may. And we've asked Mr. Toomey if we can sort of chop up the argument. I'm going to do 12 minutes, primarily focusing on standing. And Dr. Black's going to address three claims survived the standing analysis, but were then dismissed on a 12 v. 6 motion. So you want 12, and then you're going to do the two-minute rebuttal? Yes, Your Honor. Please proceed. Thank you. This case is about individuals that suffer from Fabry disease. It's a rare disease in which there's a genetic mutation in which these individuals are missing a gene that breaks down fat in the blood. Mount Sinai Hospital came up with a treatment in which they infuse each patient with that missing enzyme. And therefore, the fat can be broken down. They licensed that treatment and that patent to Genzyme. And Genzyme has since manufactured and sold Fabryzyme, the synthetic enzyme. This whole case arises out of claims that occur because of a shortage of Fabryzyme. Genzyme's plant was contaminated at some point before July of 2009. And due to that contamination and the halt of production of Fabryzyme, Genzyme came up with an idea to give these patients less than their full dose. And that has resulted in personal physical harms to these individuals and also financial harms. Could you break that down? Because for at least a significant number of your clients, as I read the complaint, there's an allegation that they received a contaminated product that caused them rashes, other harms, anaphylactic reaction, et cetera. Yes, Your Honor. And so it's a little hard to understand how they wouldn't have an injury, in fact. We can find out from the site. But you also seem to not put much weight on that. You also seem to be saying that simply supplying a half dose instead of a full dose was actionable misconduct that caused an injury, in fact. Yes, Your Honor, exactly. Even if it wasn't contaminated? Yes, Your Honor. Could you explain how that could be? Absolutely, Your Honor, in two ways. So there's a biological phenomenon behind it, which is less than full doses actually accelerate your disease. I will not do an excellent job of this, but I'll do my best doctor impression, which is low doses, so this enzyme is a protein. Okay, and then you also say less than full dose, it turned out, could overly sensitize a person. Yes, so once they went back to the full dose, and those claims survive standing because it's clear that some people went back to the full dose and had anaphylactic shock, much like all of a sudden a kid with a peanut allergy taking a handful of peanuts. Okay, are you alleging that anyone who received a half dose, but who claims neither acceleration nor sensitization, that they would have a claim? They would have an economic claim. For what? Because they paid for the dose, and a half dose isn't half as good. It has no efficacy at all. But don't lots of drugs turn out for many individual people to have no efficacy, even though they do potentially help others? Oh, I understand, Your Honor. You're saying there's some drugs that will work for people, but maybe not every person. Your Honor, I've worked for very few. Okay. Your Honor, I think a couple things about that. One, it was represented to these individuals that it would work. It was a specific representation. If you take this low dose, it's going to work. Not as good as the full dose, but it will work. Behind the scenes, and we've come to unearth documents, is that they knew it wasn't going to help them. They wanted to maintain these plaintiffs as customers. This is an expensive drug, and they were making a lot of money off these people. So I think if you represent to someone, both intentionally or negligently, if you tell people negligently this will work for you and it doesn't, I think you would have a claim. They spend a lot of money on your representation that it's going to work. Counsel, as I read, like Judge Kayada, I wanted to separate out the contamination from the acceleration and sensitization. But I thought you were also making an assertion that getting half a dose was worse than getting no dose at all. But thus far, you haven't mentioned that. Is that part of your case? It is, Your Honor. And I apologize, when I was answering Judge Kayada, I was trying to say that the half dose triggers a reaction in the body that actually accelerates your disease. You are better off, the allegation is, and this will be left ultimately, in our opinion, to expert testimony and statistical data, but a half dose actually accelerates your disease. You are better off not taking any dose at all. Okay. So then when you answered Judge Kayada's question that asked you to assume no contamination, no acceleration, no sensitization, your answer was imprecise because you are saying at half a dose necessarily there is acceleration. Yes. These plaintiffs personally reported a worsening of their symptoms faster than they had ever experienced before. Doctors would note that. And the EMA, the European equivalent of the FDA, they had come out with a report saying we've been looking at this, these half doses, it has to stop here. These people are having more AEs, adverse events, than they ever would have, not before Fabrizion ever came to market. But your other claim, we've got categories of people for whom you're saying the half dose, in fact, caused harm. But then I think if I'm following you correctly, you're saying other people who, although they incurred no harm as a result of the half dose, they were essentially sold and paid for at a drug price, the equivalent of saline solution. Your Honor, I thought that was a hypothetical. Every one of these plaintiffs who took half doses experienced a worsening of their symptoms at an accelerated pace. I thought your Honor. So there are no plaintiffs that. Are solely financial. Got it. Sorry, I apologize. To be clear, those are two different claims, but every single plaintiff experienced both acceleration and financial harms. The one issue, too, about the contamination is a VESA virus. At this point, we don't have information in terms of lots of contaminated viruses and what infusion centers those went to. But it has a similar biological reaction that half doses does. The VESA virus causes inflammation and it basically exacerbates the condition in a similar way. I was confused. The complaint, for example, plaintiff Bishop was exposed to the VESA virus, causing chronic rashes and the like. Yeah. There's rashes, but also an increased inflammation. So are you saying he was exposed to the VESA? Is there an allegation? I thought there was an allegation that he was exposed to a contaminated law. We believe all plaintiffs were. Okay. But part of the reason I bring that up to the Court's attention is that the trial court said, well, you don't know that they had it. You know that their plant was contaminated with it, but how do you know in regard to these plaintiffs? And we're saying at this initial pleading stage, we believe that the circulating rashes, that is a symptom and an injury, but it's the least of their injuries. If they did, in fact, get contaminated with VESA virus, it would have led to an increased inflammation, which also accelerates the disease. The defendant is trying to revive or raise before us a statute of limitations argument that then leads to, as I understand it, a jurisdictional argument. I want to give you a chance to comment on your first argument, as I understand it, is that they didn't cross appeal. Correct, Your Honor. And I think I can think about how to figure that out, but is that with respect to all plaintiffs that they should have crossed appeal? Is that your position? Yes, Your Honor. With respect to the statute of limitations argument, Genzyme was not successful. These claims made it through, and therefore if Genzyme wanted to challenge the ruling of the trial court, they should have crossed appeal and allowed for full briefing on both sides. What's the test that you advocate we use to distinguish between situations in which you can raise an alternative argument not adopted below in your red brief, as opposed to situations where if you want to raise something that was rejected below, you need to cross appeal? Your Honor, I think comparable to perhaps that last case, the uniqueness of it would be this would be a dismissal with prejudice, if you were to grant a statute of limitations argument. And also, Your Honor, I do think, and the trial court alluded to this, even if that argument, you were leaning in the way of Genzyme, there are some factual issues that have to be discussed as well regarding that, including the discovery. Staying with that, and I think that's the case law that you've accurately stated, staying with weren't four of your plaintiffs dismissed with prejudice? Yes, Your Honor. Three of the plaintiffs, one claim for each of three plaintiffs, which is that anaphylactic shock that Dr. Black was going to speak about, those had been dismissed with prejudice. Okay. Let me follow that a little further, if you might, and if necessary I'll save you some of your time. Let's assume, without you conceding anything, that we were to allow them to raise a statute of limitations issue, and we were to decide that the court below erred in its construction of the tolling agreement, that the tolling agreement simply put a pause, it didn't revive anything that had already been expired. If we were to adopt that, do any of your claims survive the statute of limitations issue? Yes. Your Honor, so I break it down like this. Your Honor, the first cause of action was the Hawkin donor. Those were all timely filed, and I don't believe there's any dispute as to that. So from the time they started low doses in July of 2009, a lawsuit was filed in April of 2011, so that's within two years, no matter what state statute you're looking at. Those individuals are timely filed, all preserved. There's a subsequent action, a DOMO, which we believe any subsequent filing, it gets very nuanced because there was a subsequent outbreak, but those individuals would be part of American pipe tolling. So Hawkin donors filed. Anyone that experienced a similar injury from the similar source would be able to, there had not yet been a ruling on class. Those individuals could file their claims. They're consolidated. They are then dismissed, and right away a tolling agreement is entered. Well, there was a gap. The dismissal in the district court took place in 2015. The tolling agreement was in 2017. Yes, sorry. There's a gap. That would be the savings clause. You would have, within the dismissal, the tolling agreement was entered into right before the savings clause was going to lapse. By the savings clause, are you referring to the journey statute? Yes, sorry. So go back to my original question. I think you are now saying that there are none of your claims that would survive if we adopted the defendant's view of the tolling agreement and did not find the journey statute applicable. We did not find the journey. You need either the tolling agreement or the tolling agreement. Yes, I understand your question. I think that's fair, Your Honor. If the journey statute does not apply, these claims would have, yes, would have lapsed. Okay. And then what standard should we use in deciding whether the journey statute applies to persons who were not parties to the prior case or to claims that were not made in the prior case? So I think all claims were made in the prior case. Is that fair? I'm sorry. I'm not understanding it. That's all right. Well, what about persons who weren't parties to the prior case? All these plaintiffs were parties to the prior case. When you say prior case, are you referring to Hockendotter solely? Yes. Okay. I think the Adamo plaintiffs, I see no reason why they shouldn't benefit from American pipe tolling. If they see that a case is filed by Hockendotter and aren't they allowed to sit back and say, let's see what happens with that, instead of waiting on a ruling on class, they are then permitted to join. And I've not seen any case law to the contrary on that. I distracted you when you had about a minute to go that you wanted to say something. I think, Your Honor, unless you have any further questions, anyone on the panel, because I could go on and on about these particular claims, but very simply, I think if you take a 50,000-foot view, you know there's cognizable claims. We're working on getting the magic wording and pleading these people. At this point, we have statistical analysis from the EMA, comparable to the statistical analysis that was used in the in-ray Neurontin case. We have internal data from Genzyme themselves saying this doesn't work at half doses, and therefore I believe these people at this very loose, plausible stage should be permitted to go forward and fine-tune the causal analysis. We'll hear from your colleague now. Thank you. Thank you, Counsel. At this time, if Attorney Black would introduce himself on the record to begin. Good morning, Your Honors. Alan Black for Plaintiffs Wilkins, LaForce, and Stanziano. As my partner mentioned, these are the plaintiffs that experienced what we're calling low-dose sensitization. Over the course of the shortage, the repeated low doses caused the immune system to recognize the protein Fabrazyme as foreign to their body, similar to a peanut allergy. This is well-established scientifically. It won the Nobel Prize, low-dose sensitization.  My partner said, like I say, it's sort of a hypothetical, what if the drug were strictly like saline, it just didn't have an effect? One of the problems, at least we've put in the complaint, is that these patients have a chronic illness. So by substituting a low dose, which is ineffective, they lost the benefit of treatment. So it's the loss of benefit, not the fact that low dose causes physical injury, as opposed to the three plaintiffs here. Doesn't that presume that Genzyme had a duty to supply the drug? That's an interesting, I actually argued the Wakanada case in Florida. Suppose Genzyme had said, we're not supplying the drug to anyone in the United States, we're just supplying it to people in France. Right, they would go somewhere else. Well, if they had done that, what would have happened? Personally, I think that... Would Genzyme be liable if it did that? I think RepliGal would have been imported into the United States under really an emergency standard. Even though it's not FDA approved, it's approved in the EMA. And I think that was actually what was happening. People were getting compassionate use exceptions for RepliGal. So, but, you know, so that's one possibility. The other one is just not taking it. So every time somebody took it, they knew, well, they didn't know. We know after the fact. They weren't going to get a benefit, but they risked anaphylactic shock every time they took it. So it would be irrational to take an injectable drug that's ineffective. You can go to the GNC and get a drug that's ineffective, it's no big deal. But to go to an infusion center and risk these deaths seems like there should be a warning with that. For sensitization, of course, it met the standing standard, but it's been rejected under state law theories on the merits for 12b6. The primary argument is the learned intermediary doctrine. And as I understand the learned intermediary doctrine, the doctor acts as an intervening causal element, breaking the causal chain. In this case, the patients, these patients, had full prescriptions and Genzyme, not the doctor, substituted the lower dose. So first, the learned intermediaries had no data. Genzyme did have data on low dose, had no data on the effects of low dose, so they're not learned in the normal sense of they can predict or help you make a decision. And they're also not intermediary because they didn't prescribe the drug in the first place. This was a mandatory substitution. And then I will say I misstudied Florida and Virginia law for negligence per se. And I believe this falls under the Shelby versus the city, I'm sorry, Johnson versus the city of Shelby. This is a Rule 8 issue. It's easily fixed. It's a mistake. And certainly the court, I don't know, the lower court dismissed negligence per se for Mrs. Wilkins, but without an explanation. So at least for Mr. Stanziano and Mr. LaForce, I would ask just the opportunity to amend that this shouldn't have been prejudicial on the merits. And we didn't have a chance for oral argument either. And finally, there's a lot of discussion about breach of warranty. And under an implied system, of course, when you sell a drug that's quote FDA approved, even though it's off label, it's going to be safe, it's going to be effective. So if there's knowledge to the contrary, of course, somebody would be told. This was sold directly to the plaintiffs. They had case care managers. They had doctors that were talking to their doctors from Genzyme. So it's a very intimate relationship where this information could have been passed on. And as to express warranty, they're correct. There is no warranty on the label which says the lower dose will work for you. But that's because, again, the FDA only approved the full dose. And out of equity, we've also asked for publication of the data. So at this point, Mr. Mooney of the original, that was the Adamo case, was able to go back to the trial court. And he has the same symptoms as Mrs. Wilkins, Mr. Stanziano, and Mr. LaForce. So it's a recognized valid causal chain. And I don't think the doctors interrupted that. And then finally, this is an important issue of public health and safety. So before the state, tort laws are essentially read into a... Excuse me, I'll wrap up. An exception is read into the state's tort laws. It should be certified to them. Thank you, Your Honors. I truly appreciate your time. Thank you, Counsel. At this time, would Counsel for the Appellee please introduce himself on the record to begin? Good morning. Good morning, Your Honors. May it please the Court. With me are my colleagues Renee White and Christopher Fonz from Ropes & Gray. And I'm here on behalf of Genzyme Corporation. I'm happy to start at some place that you prodded me to start, or I can walk through our arguments. For the listening audience, you should introduce yourself as well. Robert Jones, Your Honor. Thank you. Your Honors, Genzyme's position is that the District Court correctly determined that all but three, four of the plaintiffs did not adequately plead that they had Article III standing in this case. The District Court below applied a ruling from the First Circuit in, the predecessor to this case from just a number of years back, where these very same claims essentially were dismissed. Counsel, please. We've read the second amended complaint. They are not virtually the same. Although the District Court said it had read the second amended complaint, it certainly did not, in its brief discussion of this issue, highlight any of the added pleadings, which the plaintiffs say made up for the deficiencies in the earlier complaint. Can we please start with common ground? Yes, Your Honor. If I could articulate what I think is in common about the two sets of claims, particularly with regard to standing. I think what the First Circuit did in the original Hockindonor case is say that you cannot group harms together, particularly harms that are not distinguishable from the natural progression of Fabry disease and other speculated harms, and then group causes together, which may or may not be the cause of those harms or the acceleration of those harms, and point the two at one another and sufficiently have alleged an injury in fact and a specifically direct causal link between the two. But if we look at the actual second amended complaint, and I just re-read it last night, it takes, for example, Bishop. It says Bishop received a dose that contained a visivirus that led to chronic rashes. How is that possibly not injury in fact? So it is important if you give me a moment to also tease out the distinctions between these theories of harm, because you've gotten at one of them. I have very much in mind the acceleration or the non-acceleration. So I will now turn to that. There is not in the complaint anywhere a competent allegation that any vial of Fabryzyme was ever tainted with the presence of visivirus. But I want to get to plausibility then, Your Honor, because the allegation, the story in this case, is that at the Alston plant in 2009, there was discovered in a bioreactor the presence of a virus that caused a batch to come down. This is a 12B1, 12B6 motion. What I do is I take the complaint, I look at the allegations of fact that aren't conclusory, I take any reasonable inferences from them, and I assume them to be true. There is an allegation of fact that your client sold them a dose that was contaminated that caused rashes. You don't get on a 12B6 motion to come in and say that didn't happen. With respect, Your Honor, when the only allegation of the presence of visivirus is in a bioreactor that is used for the manufacture of a different product. The complaint doesn't say that. It does, though, Your Honor. I believe it is both clear from the complaint and from materials incorporated into the complaint that the bioreactor that was found to have been contaminated with vesivirus was used for the manufacture of a different biologic, cerezyme. So there's no direct link between the contamination with the virus and the Fabrizyme product at all, and the allegation that Mr. Bishop or anyone else was exposed to a virus because it was contained in a Fabrizyme vial is pure speculation. How about their allegation that taking the half dose caused allergic reactions when they then were exposed to the full dose? The three plaintiffs who allege that, I think, have now conformed themselves to the Mooney allegation that the First Circuit found was adequate for standing back in 2016. Then how about the ones who claimed it accelerated? The impairment, the flaw with the acceleration allegation, and this really is the core of the first Hockendonor decision, is the failure to properly and plausibly allege that there actually were accelerated, what we would call accelerated symptoms. There's just the word acceleration and then the reciting of the symptoms. Well, Hockendonor held that it wasn't related to any plaintiff. There was no allegation that a particular plaintiff, in fact, had it accelerated in a way that would not have accelerated without the dose. Here, though, we've got a different complaint, and this complaint, again, as I look at it, it seems to have a number of people who are saying it was accelerated in them. Well, Your Honor, what I would say is almost every time they recite a plaintiff, specifically in this complaint, they use the word accelerated. Counsel, you can choose to stand or die on Article 3, but you've had some warning signs that perhaps we read the complaint differently than you do the second amended complaint. So normally we start with Article 3, we deal with jurisdiction first, and only then do we move on to issues like statute of limitations, tolling agreements, and the like. Judge Kayada asked your opponent about the statute of limitations, and whether it barred all claims based on two assumptions. It would help me if you would get into that. Yes, Your Honor. I agree with my brother's response, which is I do think that all of the claims would be time barred, but I want to make clear that one of our statute of limitations arguments is really a subject matter jurisdiction argument, and that argument is that one particular claim is plainly time barred. That is the fraud theory around the financial harm from payment for low-dose Fabrazyme. That is the so-called CAFA claim. That is the claim in this complaint that the plaintiffs point to as the sole basis for federal subject matter jurisdiction. The district court below found that that claim had expired by March of 2013. That's before any of the prior claims and cases even were dismissed. That fraud claim ran, and they never filed it, and they never made that claim in the first complaints. They filed it for the first time seven years later in 2020, plainly late, and the absence of that claim from this complaint renders the case, the entire case, without federal subject matter jurisdiction. That claim, that argument I just made is only correct if we are correct that Judge Woodlock misconstrued the tolling agreement. I can say that. He ruled against you on the tolling agreement, and then you didn't cross-appeal. We did not have a negative ruling against us below Judge Keanu, and so I think we are entitled to raise as a flaw in the court's reasoning. Well, don't you want to change the judgment? We want to change the ultimate judgment, but he did not render a judgment. Isn't our case law clear that if you want to change the judgment, you need to cross-appeal? We had a judgment of dismissal of the entire claim. Without prejudice? Without prejudice. And you want to change it with prejudice if the statute of limitations bars the claim? Well, I think it will be up to this Court. Well, that would be, to rule in the statute of limitations is to rule in the merits. It would be with prejudice. So how do you not cross-appeal? Your Honor, we felt that we were not required to cross-appeal, first of all, given the standing of the arguments and the ultimate judgment in the case. Also, the nature of Judge Woodlock's reasoning, which was, in fairness, to agglomerate the statute of limitations arguments, render them flawed by the tolling agreement, but then also to caution that he wasn't sure how the Indiana journey account statute would apply in any event. So help me. We have to distinguish between losses below by a prevailing party that have to be cross-appealed to be preserved for appeal and those arguments that can simply be advanced in support as an alternative grounds for affirming the judgment below. What test would you use, would you have us use for deciding here in this case whether you have preserved the issue without cross-appealing? I believe the test, Your Honor, is whether or not the independent ground that we are arguing to the Court is sufficient ground for affirmance of the outcome of the decision. Isn't the test whether it would change the judgment? In other words, you can advance something in defense of the judgment as an alternative grounds for sustaining a judgment, but if you want to argue the judgment actually should be changed with prejudice, don't you have to cross-appeal? I don't believe we do, and we're looking to affirm the dismissal of the decision below. And is there any case that would support you on that proposition? Other than what we've got in the papers, I don't have any. Let's put that for one side for a minute, and what's your argument for why the Indiana journey statute would not apply to any of these claims? There are two arguments. First, with respect to the narrow federal subject matter jurisdiction argument, that loan claim, that claim had run and expired by March of 2013, according to the district court's examination. Therefore, that claim was not extant at the time that this case, the Haakon Donor and Adamo cases were dismissed. There was nothing to be saved. They weren't in that case, and they were no longer live claims to be pursued at that stage. So there's no analysis on which any saving statute in Indiana or otherwise would save those claims. They had expired by that time. So independently, with respect to the federal subject jurisdiction. I'm sorry, before you get there. Okay, your assertion is they had expired and they were not saved by the tolling agreement. But if perchance your failure to have cross-appealed means you cannot attack the district court's ruling on the tolling agreement, where does that leave you on the Indiana statute? I think it then takes me then to the next ground, which is the argument that the statute of limitations bars all of the claims. So putting aside the independent federal subject jurisdiction argument, Judge Woodlock took the time to examine the timeliness of all of the claims. But if we read the tolling statute the way he did, it was like a get-out-of-jail-free kind of revived toll claim. I think that's right, Your Honor, but I'll just tie a bow around that in the way that I think about it. He summarized when he said all of the claims in the case expired. He found that all of them expired well before the tolling agreement was actually executed. But then he held that the tolling agreement, in fact, was a sort of a revival agreement, a restoration agreement that actually revived all of those claims and resulted in them springing back to life, despite a sentence in the tolling agreement that I think clearly says otherwise. Indeed, many of us will recognize in tolling agreements a sort of anodyne language that says the tolling begins on such and such a date. Even that language has no purpose at all if the tolling agreement is actually a restoration agreement that revives the claims. So we do submit that, respectively, that Judge Woodlock got the tolling agreement wrong. And because he did take the time carefully to examine the timeliness of all of the claims, he did lay the predicate for why all of those claims are not timely and could be subject to dismissal on that basis or for failing to plead timeliness on that basis. But I think Judge Lynch's question to you was assuming you haven't raised the challenge by cross-appealing to the interpretation of the tolling agreement, then what are you left with under statute of limitations? I think nothing. If we are required to have cross-appealed, those arguments are not implicated, Your Honor. Okay. Thank you. Finally. You've got six minutes left. Your Honor, back on standing, just so I have a chance to at least address it. Judge Woodlock evaluated five theories of harm, and again, he looked at the way that the plaintiffs in this case we submit really did functionally not change the substance of the allegation in terms of referring to low-dose defective Fabrazyme, in quotes, and meaning by defective Fabrazyme, both low-dose and particulates and vesivirus all kind of speculated in terms of contamination. And then without actually making an allegation that any of those things caused any of these things, matched them up with the symptoms of the disease. The district court below found in the Adamo and Hockendonor claims, there's no duty to supply the market. It's very important under the first Hockendonor decision that there be competent, plausible allegations of an accelerated experience of disease before there's any standing and before there's any claim under the law of the case. And while this Second Amendment complaint does separate out each plaintiff as sort of a visual response to what the Hockendonor court said. By visual, it means it has the allegations that were missing, the key allegations that were missing in Hockendonor. No, because it really just alleges it in the same way that many dozen times, Your Honor. It doesn't actually, plausibly say that any of the symptoms were accelerated. It doesn't actually say that any product was in fact contaminated. Remember that these plaintiffs all were taking reduced doses because Genzyme had a shortage. And went to them and said, you're going to be taking a reduced dose. Yes, Judge Lynch. I hate to interrupt the flow, but going back to the statute of limitations question, you argued that the fraud theory is clearly barred because independent, I believe you're arguing independent of all of the other statute of limitations assertions as to the other claims that are asserted. You say it's clearly not made initially and was not made for seven years. Is that an independent argument that has nothing to do with the tolling agreement? To be clear, Justice, Judge Lynch, we believe it has nothing to do with the tolling agreement. We believe that those fraud claims never were implicated by the tolling agreement. We believe we executed the tolling agreement after the time that those fraud claims had expired. The only reason for the interposition of the tolling agreement into the argument is because the plaintiffs raised it and sought to take advantage of it. We think they cannot take advantage of it because we think the fraud claim was barred, it was time barred years before the tolling agreement was issued. Now let's dig down a little bit. Are you saying there was nothing in any of the pleadings that sounded in fraud? There were allegations in the Hockendooner and Adamo complaint that Genzyme had misled the plaintiffs. There were allegations. There were not claims, but there was that allegation and in fact pointed that that allegation is one of the ways that we, and I believe also the district court, recognized that those claims had started to run because the plaintiffs knew they had this theory, whatever the basis for it was. Now they did not bring that claim and they quite expressly added to the second amended complaint the fraud theory and this putative class action on that basis in order to supply themselves with federal subject matter jurisdiction. And so it's clear that they did not believe themselves that they pursued that claim until 2020. Okay, we're not in the business of getting into what people believed. We just look at the papers. If I've understood you correctly on the fraud claim, it was not adequately alleged until the second amended complaint and one of the reasons, two of the reasons it was not adequately alleged were it didn't comply with a separate cause of action. Did I understand that correctly? No, Your Honor. Well, perhaps. We didn't make a Rule 9 argument in the Hawk and Donor and Adam Oak claims with respect to this count because the count was not present in that case. And even though they may have alleged that they were misled, they didn't bring a claim for relief on that basis in the first complaints. So those claims were not in the Hawk and Donor and Adam Oak complaints. Yeah, but it gets dismissed without prejudice and then they file a second amended complaint and in that second amended complaint they are much more specific about the nature of the fraud that they are claiming. Yes, Your Honor, and I want to be sure I'm being specific about which are the first complaints and which are not. I'm talking about the fraud claim being absent from the Hawk and Donor and Adam Oak complaints that were filed in 2011-2013. This action was first filed in the Southern District of Illinois in 2020. I can't recall whether there were additional allegations in that first representations, but the addition of the fraud claim to this action came either in the first or second amended complaint in this action and that was filed in 2020 as well. Those two were filed in 2020. Judge Linton? Thank you. No. Judge Montecarlo? No, thank you. Let me make sure I'm having a little trouble from your brief understanding of jurisdictional argument. Are you saying that the sole basis for subject matter jurisdiction is Class Action Fairness Act because there is not complete diversity, point one. Point two, the class claim you read as being limited to the fraud count? Point one, yes. My response is yes. Point two, fraud theories. I don't know whether they would have arguments that it cuts across unfair trade practice or any of the other claims that they brought. But you're saying all the claims for which they seek class certification are contingent on some fraud theory? All of the claims for which they seek class certification on the grounds that they were misled into purchasing the drug, this is the financial harm, that theory is new to this case, was not pursued back in 2011, 2013, comes nearly ten years too late and is the sole basis for CAFA jurisdiction. Okay. So the fraud theory is the sole basis for CAFA jurisdiction. You're saying they only want a class that advances claims, the merits of which are contingent on a finding of fraud? That is correct in the Second Amendment complaint. And then you're saying that if one of your defenses to the fraud theories is valid, i.e. a statute of limitations, and so you eventually get judgment based on that, that therefore means that there's nothing left for the class action, is that what you're saying? That means that there is no longer any claim left in the case that supplies federal diversity jurisdiction under CAFA. Okay. So would that mean that in every CAFA case in which there's not complete diversity, once the class is denied or the merits, how do you have no jurisdiction and yet have a merits ruling? And yet you seem to say that the merits ruling is a necessary step in getting you to no jurisdiction. I think here we're talking about whether the sufficiency of the pleadings, Your Honor. And if it is sufficient on the four corners of the complaint to establish that the claim upon which federal jurisdiction rests is in fact time-barred, then the court is divested of federal subject matter jurisdiction. I concede that there will be cases in which you can proceed down the road because the pleading doesn't have that failure, but the substance of discovery and evidence later suggests that there's a timeliness problem. But in this action, we submit, and certainly the district court found, that those claims clearly had run by 2013. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, if Attorney Gesk would reintroduce himself on the record, he has a two-minute rebuttal. Jonathan Gesk on behalf of the Plaintiffs' Appellant. I'll be very brief, Your Honors. First, with respect to the class claim, it is not contingent on there being a finding of fraud. It is just the central overlapping harm to all these people is the economic harm. They have different physical injuries, and therefore they don't have all the same common issues, and those claims have been separated out. But the economic damage is overlapping, and the issues going into the economic damage are the same for all of them. They paid for something. At best, it didn't work. At worst, it may have worsened their condition. With respect to the fraud being a new claim and where it falls into other causes of action, again, we would rely on a discovery rule finding, which is plaintiffs did not know about what Genzyme do, and the internal documents that we cite throughout our second amended complaint until we were able to unearth the documents from the Shubert case in the District of Utah. As soon as that was done, the pleadings were filed making specific reference to the fraud that was being committed by Genzyme. And lastly, Your Honors, again, it's been addressed whether you have to cross-appeal with respect to this jurisdiction issue, but I did just want to highlight in our short reply brief where we raised this issue of failure to preserve the jurisdictional argument. It says, we have distinguished between a district court's conclusion regarding the ultimate question, whether it has subject matter jurisdiction under CAPPA, and the district court's resolution of specific factual disputes in the course of reaching that conclusion. And this First Circuit has said in the Paisel case, the former determination we have explained is evaluated de novo, while the latter is reviewed for clear error. Let me ask you to address a practical ramification of that in this case, the way it's posited. If we were to agree with you that the interpretation, the district court's interpretation of the tolling agreement was not preserved by appeal because a cross-appeal was not filed, if I'm correct, that wouldn't be a waiver of the defense. It would be a waiver of the ability to have us address now whether the court was correct. So you would go back down after this appeal and you would proceed forward. But ticking away in the case... It's going to be raised again. It could be raised from a final judgment. If we're now convinced by reading the excellent briefs that both sides have filed that the court just missed it on the tolling agreement and that the tolling agreement simply is stopping the running of the clock while the parties are negotiating until it's stopped, but it doesn't reach back in time and revive anything, if we were to be convinced of that, I'm not sure whose interest it would be in for us to wait for two or three years from now after two or three years of litigation and then announce that. Your Honor, I appreciate that as well. I get that. That's certainly a concern. I mean, the plaintiffs don't want to go through this knowing this is hanging over their head. But a couple of things. One, you're speaking practically. But procedurally, we don't love the trial court's analysis of the statute of limitations issue either. And there are things we would probably want to fully brief and we feel we didn't get that chance. And to that end, we also think, yes, it could be two years down the line that this comes back. But we believe there will be some factual, some testimony that may change the court's analysis. If we were to reach out and decide the tolling agreement and decide it means what the defendant says it means, then that would then turn our attention to the Indiana Journey statute. And it seems if you are correct in your reading of that, that it applies to these type of claims, then you've got something to stand on. And if you're not, as we discussed earlier, the case would seem to be dead. I think that's fair, Your Honor. Are you saying you haven't had a chance enough to address the Indiana Journey statute? Your Honor, if it was an issue that this court was going to entertain, the whole jurisdictional, I think we would respectfully request a chance to at least brief it a little more in depth and dig into those cases, because in our first brief, 40-some pages, we didn't touch on it at all. In our reply brief, we spent half of it saying, well, it's waived, and then we tried to briefly touch on it. I have a question. In your first argument, you mentioned the discovery rule as it pertains to statute of limitations issues, and you made the argument to us that you were entitled to do some discovery. You also argued that until you knew what Genzyme knew, and you didn't find that out until a third lawsuit, you couldn't have pled any type of fraud or misrepresentation. Now, the discussion you've just had with Judge Kayada doesn't refer at all to any form of discovery. You did refer to some factual development, which I had assumed you meant would take place in the district court. So I'm a little confused about the concessions that have been made here and whether they're contingent on the notion that more discovery has to happen. Yes, I apologize, Your Honor. With respect to discovery, we learned through the Second Amendment complaint, or sorry, before the Second Amendment complaint, about the internal, I guess, information Genzyme possessed, that they knew it didn't work and that they were lying to the plaintiffs. And what I was getting at, Your Honor, is with respect to fraud, I believe the discovery rule should apply. And therefore, in discovery, when we secure, I guess put it another way, we've made allegations in our complaint and we've referenced bait-stamped documents from another case, but I don't know that that really amounts to evidence at this point. We'd want to secure those documents on our own and testimony on our own, whether it be to revive fraud claims or to defeat any statute of limitations argument, saying, hey, we've conclusively learned about this, you guys kept it hidden, and therefore the statute of limitations should not have run until that information was unearthed. Does that not apply to the negligence and implied warranty claims? Your comments are totally addressed to the misrepresentation and fraud claims. Right. I think that the information the plaintiffs reasonably possessed at the time of the initial lawsuit was sufficient for a negligence claim. And that's why I've limited this idea of now we know they had firsthand knowledge. It wasn't just a mistake. And it's not just our speculation that their condition accelerated. Genzyme, you knew that people were experiencing worsening conditions. In fact, they reached out to Australia, Australia Socialized Medicine. Australia found out the United States patients were taking half doses, and they said, hey, can we stop buying full doses? And they said, oh, no, half doses don't work at all. Don't do that. Okay. Thank you.